[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case was remanded by the Supreme Court for a new trial. Wright v. Woodridge Lake Sewer District, 218 Conn. 144 (1991). Those facts not in dispute are set out in that opinion and need not be repeated here.
Testimony at trial established that until 1980, the capacity of the district's sewage treatment system to handle the sewage generated CT Page 1021 within the district was not a concern. The district was then operating under a permit issued by the Department of Environmental Protection (DEP) in 1977 for treatment of 40,000 gallons per day. That permit was to run until 1982.
In February, 1981, the sewer authority received a request to hook up a planned forty-unit apartment complex. At that time, the average daily flow into the system was reported to be 48,250 gallons. The authority discussed the request at its March 18, 1981 meeting. The authority's counsel explained that they had operated on the basis of being able to guarantee hookup to any owner of a lot within the district. After a discussion of the lack of zoning in Goshen, counsel agreed to look into whether the district, itself, had the power to form a zoning commission within the district. The president of the district who also served as chairman of the authority testified that the authority was concerned about this issue of fairness to landowners outside of the planned unit development in providing access to sewers. The authority ultimately decided against pursuing zoning powers. In the summer of 1981, preparations were being made to apply to DEP to increase the allowed daily flow to between 150,000 and 200,000 gallons per day. At its meeting on August 19, 1981, the authority discussed the effect that future development of vacant land within the district might have on the capacity of the plant. The authority was concerned that if development of the vacant land in the district produced a density equal to that of the planned unit development, the capacity of the plant would be jeopardized. The members decided to request that counsel investigate the possibility of enacting an ordinance limiting hookups to single family dwellings.
At the authority's meeting on September 16, 1981, counsel for the authority reported that the sewer use ordinance could be amended in one of two ways to restrict hookups: either to one dwelling unit per acre or to the equivalent of one dwelling unit per acre. While the district's permit required DEP approval for any permit to hook up except for single family dwellings, the authority was concerned that the DEP might not continue its oversight of applications for multi-family dwellings or might approve such applications without realizing the impact of approval on the sewer system. The board decided to propose a change in the sewer use ordinance which would limit permits to the equivalent of one dwelling unit per acre or smaller lot of record. A dwelling unit equivalent would defined as a use reasonable expected to generate less than 200 gallons per day. Special meetings of both the Woodridge Lake Sewer District and the Sewer Authority were called for November 18, 1981. By vote of the members of both bodies, the proposed amendment, explained as an effort to control the amount of effluent discharged into the system and to protect the capacity of the plant for future homeowners at Woodridge Lake, was adopted.
In 1983, the district applied for a permit to treat 200,000 gallons per day, the designed capacity of the system. When the principal sanitary engineer for DEP toured the facility, he felt that the methods used to CT Page 1022 determine the capacity of the system were inadequate. In 1984, the district and DEP agreed on a plan of testing to provide DEP with evidence in support of the application. In August, 1985, plaintiffs submitted an application to hook up forty-one condominium units in five buildings to the sewer system. The project was proposed for an eight and one quarter acre parcel of land within the district. Plaintiffs submitted proposed plot plans, sewer hook up plans and an elevation plan with their application. At the authority's meeting in October. 1985, the application was voted down on the grounds that it did not comply with the sewer use ordinance.
At the time the ordinance was amended in 1981, the defendants' permit allowed treatment of 40,000 gallons per day. In October, 1981, the average daily flow was 36,600 gallons. Although the district had projected in 1983 a flow of 45,800 gallons per day for 1980 and 63,200 gallons per day for 1990, and 82,000 gallons per day for 2000, reports of average daily flow filed with DEP show that the average daily flow for October, 1991 was 80,000 gallons.
Between 1984 and September 1985, the district did not submit reports of testing adequate to satisfy DEP with regard to the system's capacity. In January, 1986, the principal sanitary engineer for DEP wrote to the district's engineer expressing his concerns regarding the adequacy of the information provided to support a conclusion on the operation of the land application portion of the treatment system. The major concern of the DEP was then the hydraulic capacity of the site for treatment purposes. In 1989, the district and DEP entered into a consent order which allows the district to treat an average daily flow of 100,000 gallons. Under the terms of the order, the district agreed to establish and implement a groundwater monitoring program, to develop and install a system to distribute uniformly the effluent to the ridge and furrow system, to develop a manual for the land application system and to investigate the hydraulic capacity of the system. A schedule was established for accomplishing steps preliminary to full compliance with those undertakings. The district is behind schedule in submitting a hydraulic capacity study, plans and specifications for the distribution system and the manual. At the suggestion of the DEP Sanitary Engineer responsible for oversight of the district's land treatment system, the district requested that action on both the manual and the plans and specifications for the distribution system be tabled until completion of the report on the hydraulic capacity of the system.
At the time defendants adopted the amendments at issue in this case, their engineer had reported on the impact of a 40 unit project on the sewer system under the existing permit. The defendant were then planning to seek a permit to treat 200,000 gallons per day. Although the existing permit was to expire in March. 1982, defendant did not submit its application until August, 1983. That application was not even a complete one. In 1984, a plan of testing was proposed, but a final report was never submitted to DEP. While the defendants' system did exceed its CT Page 1023 permit levels on occasion, the DEP did not view that as critical in light of good water quality test results and the lack of danger to the public health or the environment. Testimony also showed that the defendants submitted only a fraction of the information requested and required in connection with the application. In 1988, a DEP sanitary engineer found that all of the effluent was being discharged into one bed and had been for some time. The distribution of effluent among the beds was based on ad hoc judgments and was not pursuant to any plan. According to the former engineer for the district, the DEP had been asking for hydraulic testing data on the treatment beds since 1975. Finally, in 1989 the consent order was designed to address problems in the distribution of treated effluent among the ridge and furrow beds. As of the date of trial, defendants had still not submitted its proposal for a study of the hydraulic capacity of the system.
Based on the testimony adduced at trial, the court finds that the ordinance was adopted because of concern about capacity of the sewer system to handle sewage which might or generated were vacate land in the district to be developed. That action was taken based on defendants' engineer's estimate of the impact of the addition of forty units on the system and a projection of the number of units which would be added if the vacant land were developed at the same density as the planned unit development. That projection, however, failed to take into account any of the physical characteristics of the land itself, but was purely a mathematical exercise.
Plaintiffs have sought a declaratory judgment that the sewer ordinance constitutes de facto zoning and is therefore illegal. Defendant Woodridge Lake Sewer District was formed under 7-325 of the Connecticut General Statutes. Defendant Woodridge Lake Sewer District Authority was created as the district's sewer authority. See Conn. Gen. Stat. 7-246. While the District considered adoption of planning and zoning powers, they decided not to pursue that option. As the Supreme Court recently reiterated, the planning and zoning functions are "separate yet related." Christofaro v. Burlington, 217 Conn. 103, 106 (1991) (quoting Purtill v. Town Plan Zoning Commission, 146 Conn. 570 572 (1959)). Conn. Gen. Stat.8-2 authorizes the municipal zoning authority to regulate the density of population and the use of land. Lot size and density regulations are primarily the concerns of the zoning authority. Christofaro v. Burtlington, 217 Conn. at 107. The authority to zone is vested solely in municipal zoning commissions. Finch v. Montinari, 143 Conn. 542
(1956). The ordinance at issue here limits sewer connection permits to not more than one dwelling unit equivalent per acre or smaller lot of record. The operation of the ordinance limits the density allowed on plaintiffs' property to the equivalent of eight dwelling units. While Conn. Gen. Stat. 7-326 authorizes formation of a zoning commission or planning commission or both, defendant District has not formed either. Thus, it had no authority to adopt the ordinance in question and its action was ultra vires. CT Page 1024
As the Supreme Court held in Wright v. Woodridge Lake Sewer District, 218 Conn. 144, 149 (1991), municipal regulations which are "rationally related to the public health, safety and welfare and operate in a manner that is not arbitrary, oppressive or fraudulent" are legitimate exercises of the police power. Courts are required to presume the validity of legislation. That presumption is overcome "only when it plainly appears that the terms of the legislation are not reasonable or that they are not rationally adapted to the promotion of public health, safety, convenience, or welfare. . . ." Blue Sky Bar, Inc. v. Stratford, 203 Conn. 14, 24 (1987) (citations omitted).
Defendants here did not choose to declare a moratorium on issuing connection permits to protect the capacity of the treatment system. See 11 E. McQuillin, Municipal Corporations (3d Ed.) 31.17. The adoption of the ordinance here was not supported by any engineering data, but was based on a mathematical computation of what might be generated in the future if the vacant land were developed with the same density as the planned unit development had been. The DEP was aware that the defendants experienced peaks in excess of its permit but did not view this as critical because water quality remained good and the public health and the environment were not endangered. Recognizing that hindsight is always 20-20, defendants' population projections have proved overly optimistic. While defendants' concerns about preserving sewer capacity for landowners who might wish to develop their properties in the future are and were laudable ones, the choice of limiting the density of development, absent adoption of zoning and planning authority was not reasonable. Defendants have also created some of their own difficulties by failing timely to file their application for a permit renewal and to supply fully the information necessary to support the increase requested by the application. At the time the amendment was adopted, defendants were planning to request a permit for the design capacity of the system or 200,000 gallons. With no engineering data or health data presented to support the amendment, it was not rationally adapted to promote the public health or welfare.
The plaintiffs are entitled, therefore, to a declaration that the amendment of November 13, 1981 adding section 13 to Article II of the sewer ordinance is null and void. The only reason advanced by the defendant Authority in rejecting plaintiffs' application for a sewer connection permit was failure to comply with the ordinance as amended. Equity affords relief when plaintiffs have no adequate remedy at law. An injunction may be granted to prevent the illegal exercise of power. Scalo v. Mandanici,179 Conn. 140, 145-46 (1979). Defendants are now operating under a consent order with DEP. Under the permit which expired in 1982, approval of the DEP was required for all applications other than single family dwellings. The consent order continues that requirement in effect. While plaintiffs would otherwise be entitled to an injunction preventing defendants from enforcing the invalid ordinance, plaintiffs seek an injunction requiring defendants to issue the sewer connection permit. Since defendants now operate under the consent decree, it would be inequitable to require that CT Page 1025 the permit be issued until the defendants' permit capacity is increased.
SUSCO, JUDGE